UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
PETER JOHN RODRIGUEZ,

                        Plaintiff,

             -against-

KILOLO KIJAKAZI,[1]
Acting Commissioner of Social Security,

                      Defendant.
-------------------------------------------------------------X

**OPINION AND ORDER**

21 Civ. 2358 (JCM)

       Plaintiff Peter John Rodriguez ("Plaintiff") commenced this action on March 17, 2021

pursuant to 42 U.S.C. § 405(g), challenging the decision of the Commissioner of Social Security

(the "Commissioner"), which denied Plaintiff's application for Disability Insurance Benefits

("DIB"). (Docket No. 1).  Presently before the Court are: (1) Plaintiff's motion for judgment on

the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, (Docket No. 20),

accompanied by a memorandum of law, (Docket No. 21); (2) the Commissioner's cross-motion

for judgment on the pleadings and in opposition to Plaintiff's motion for judgment on the

pleadings, (Docket No. 24), accompanied by a memorandum of law, (Docket No. 25); and (3)

Plaintiff's reply in further support of his cross-motion for judgment on the pleadings, (Docket

No. 26).  For the reasons set forth below, Plaintiff's motion is denied and Defendant's cross-

motion is granted.

---

[1] Dr. Kilolo Kijakazi is now the Acting Commissioner of Social Security and is substituted for former
Commissioner Andrew Saul as the Defendant in this action, pursuant to Rule 25(d) of the Federal Rules of Civil
Procedure.

## I.    BACKGROUND

Plaintiff was born on March 15, 1977. (R.[2] 165).  Plaintiff applied for DIB on February 5, 2018, alleging a disability onset date of December 8, 2016. (*Id.*).  Plaintiff's application was denied on May 7, 2018, (R. 67-75), after which he requested a hearing on or about July 11, 2018, (R. 24).  A hearing was held on June 18, 2020 before Administrative Law Judge ("ALJ") Dina R. Loewy. (R. 37-65).  ALJ Loewy issued a decision on September 29, 2020 denying Plaintiff's claim. (R. 24-32).  Plaintiff requested review by the Appeals Council, which denied the request on January 21, 2021, (R. 1-7), making the ALJ's decision ripe for review.

### A.    Medical Evidence[3] before the Disability Onset Date

As of November 2016, Plaintiff had an eight-year history of chronic lower back pain and a two-year history of diabetic neuropathy. (R. 361).  On November 10, Plaintiff had a pain management appointment with Dr. Germaine Rowe ("Dr. Rowe") at Healthcare Associates in Medicine ("Healthcare Associates") for lower back pain and chronic nerve pain in his feet. (R. 361-63).  His back pain—which was shooting, sharp, cutting, pressure-like and throbbing—was moderate to severe, and nearly constant. (R. 361).  It was worse on the left, and at night—to the point where it sometimes awakened him—and radiated to the right buttock area and anterior thigh. (R. 361-62).  Walking and exercise increased his pain, but he denied weakness in the upper and lower extremities. (R. 361).  Plaintiff reported that he could walk with difficulty

---

[2] Refers to the certified administrative record of proceedings relating to Plaintiff's application for social security benefits, filed in this action on October 5, 2021. (Docket No. 15). All page number citations to the certified administrative record refer to the page number assigned by the Social Security Administration ("SSA").

[3] Plaintiff does not challenge the ALJ's decision or findings with respect to his hypothyroidism, obesity or chronic tension headaches. (*See generally* Docket Nos. 21; 26; R. 26-27). Accordingly, the Court's summary of the medical evidence and medical opinions focuses primarily on Plaintiff's treatment for degenerative disc disease of the lumbar spine, gout, plantar fasciitis, diabetic neuropathy, carpal tunnel syndrome and "a right shoulder disorder." (R. 26; *see also* Docket No. 21 at 6-16).

because of the pain; sit "for hours;" and stand for one hour per day, with his daily living activities varying day-to-day. (*Id.*). He also reported some paresthesias and dysesthesias. (*Id.*). Nerve blocks, trigger point injections, physical therapy, exercise, heat/cold, caudal steroid injections and chiropractic manipulation provided no lasting relief. (*Id.*). Earlier that year on April 15 and 22, EMG/NCVs showed electrophysiologic evidence of a diffuse sensorimotor polyneuropathy in both of Plaintiff's lower extremities, and compression of both median nerves at the wrist consistent with bilateral carpal tunnel syndrome. (R. 303). A lumbosacral spine MRI from the following month showed multilevel spondylosis with osteophyte formation; bulging discs; and a small midline L2-L3 disc herniation extruding superiorly to the inferior endplate of L2. (R. 302-03).

Dr. Rowe observed that Plaintiff ambulated with a normal gait and station, but demonstrated decreased range of motion and tenderness to palpation on the paravertebral area of the lumbar spine. (R. 362). He also had diminished deep tendon reflexes at the knees, and no such reflexes at the ankles. (*Id.*). However, Plaintiff lacked atrophy or fasciculation in the lower extremities, cyanosis, clubbing or edema. (*Id.*). Plaintiff's sensation was intact and a seated straight leg test was negative bilaterally. (*Id.*). He had 4/5 strength in all lower extremity muscles.[4] (R. 362). Dr. Rowe diagnosed chronic lower back pain, lumbar radiculopathy, lumbar spondylosis, and diabetic neuropathy. (R. 363). She recommended that he continue taking Norco 6.5/300 and that he may be a candidate for neurostimulation. (*Id.*).

On November 15, 2016, Plaintiff presented to Dr. Anthony J. Alastra ("Dr. Alastra") at Healthcare Associates for a neurosurgical consultation. (R. 358). Plaintiff reported worsening lower back pain in the last year; numbness and tingling in his feet; and bilateral leg pain. (*Id.*).

---

[4] Plaintiff exhibited the same results at pain management follow-ups before his spinal column trial, on December 6, 2016, (R. 354), and January 31, 2017, (R. 350-51).

The foot tingling worsened at night and the leg pain worsened with ambulation and "progressive activity." (*Id.*).  Plaintiff had difficulty "doing usual activities" such as sitting or standing for long periods as well as lifting or carrying objects. (*Id.*).  Dr. Alastra opined that the 2016 MRI demonstrated "mild disc bulging causing mild central stenosis" and congenital canal stenosis. (*Id.*).  On examination, Plaintiff had no tenderness to palpation in the cervical, thoracic or lumbar spine midline, but showed paraspinal spasm bilaterally into the buttocks. (*Id.*).  He had full range of motion in the hips, shoulders, elbows, knees and feet. (*Id.*).  Dr. Alastra detected "baseline change" and proprioception and sensation across both feet, consistent with diabetic polyneuropathy and a nondermatomal distribution. (*Id.*).  However, Plaintiff had equal strength and muscle tone on both sides; no obvious extremity abnormalities; and a slow but steady, nonantalgic gait. (*Id.*).  Dr. Alastra assessed chronic lower back pain secondary to diffuse degenerative disc disease and lumbar spondylosis, as well as significant peripheral neuropathy secondary to diabetes. (R. 359).  Although Plaintiff had not benefited from conservative treatment, Dr. Alastra did not recommend long segment fusion due to Plaintiff's obesity, and noted that Plaintiff was not a candidate for decompression due to the nature of his neuropathy. (*Id.*).  On Dr. Alastra's advice, Plaintiff decided to pursue a spinal column stimulation trial. (*Id.*).

**B.  Medical Evidence after the Disability Onset Date**

**1.  Healthcare Associates**

Plaintiff's spinal column trial began on February 21, 2017. (R. 343; *see also* R. 347).  On February 24, he noted over 75% relief of his left lower lumbar pain, as well as radicular pain into his left leg. (R. 343).  However, the device provided no benefit in the right lumbar or lower extremity regions. (*Id.*).  On February 27, he advised Certified Physician Assistant ("PA-C") Lindsay Martino ("PA-C Martino") that he experienced continued axial and radicular pain, and the device did not sufficiently reduce his pain to justify a permanent placement. (R. 339).  PA-C

Martino removed the device and noted that Plaintiff was unchanged since his November 10 musculoskeletal examination. (R. 340; *see also* R. 362).  On March 7, Dr. Alastra suggested another spinal column stimulation, this time with a wider surgical paddle lead to obtain relief on the right side. (R. 339).  Plaintiff decided to proceed with permanent placement, feeling he "ha[d] no . . . other choice." (*Id.*).

The permanent device was placed on May 11, 2017, and turned on by Medronic's representative on June 1, 2017. (R. 331, 365-66).  At pain management follow-ups for the rest of 2017, Plaintiff complained that despite multiple attempts to adjust its settings, the stimulator was ineffective. (R. 301, 318, 322, 328, 331; *see also* R. 324).  In September, he denied shooting leg pain but still reported pain across his lower back at 8/10; lower extremity neuropathy; paresthesias in the hands and feet; and weakness in the right leg that made walking difficult.[5] (R. 322, 324, 328).  Plaintiff's musculoskeletal examination findings improved slightly— demonstrating restricted range of motion in the lumbar spine, proximal right leg weakness, and a slightly antalgic gait on September 7, but a normal, unassisted gait on September 14 and 21. (R. 323, 325, 328).  On September 14, Dr. Stephen Kulick ("Dr. Kulick"), a neurologist, increased Plaintiff's gabapentin, (R. 325), which, combined with Vicodin, reduced his pain to 6/10 with two hours of relief by October 19, (R. 309, 318).  On the same date, Plaintiff also noted the stimulator helped his legs "when laying down." (R. 318).  However, his back pain entered his right hip—causing numbness and pins and needles in the lower extremities—and the pain increased with walking, standing, sitting, and exercise. (R. 307).  Plaintiff further advised that his neuropathy caused difficulty writing. (R. 318).  PA-C Lauren Carneiro ("PA-C Carneiro") increased Plaintiff's Norco medication. (R. 319).

---

[5] However, he refused physical therapy because it had not helped in the past. (R. 328).

At an October 19 medical marijuana consultation, Plaintiff advised Dr. Glenn D. Babus ("Dr. Babus") that before feeling pain, he could walk three to four blocks, sit for thirty minutes, and stand for thirty minutes. (R. 307). Plaintiff "constantly" lay down to avoid the pain, and had difficulty performing household chores, going to work, doing yard work, shopping, socializing, exercising and engaging in recreational activities. (*Id.*). On examination, in addition to a non-antalgic gait, he exhibited normal musculoskeletal range of motion, with no misalignment, asymmetry, crepitation, defects, tenderness, masses, effusion, instability, subluxation, laxity or abnormal movements. (R. 308-09). His digits showed no clubbing, cyanosis, nodules, drainage, fluctuance or petechiae, and his extremities showed no deficits in strength or sensory or motor skills. (*Id.*). In addition to a marijuana trial, Dr. Babus recommended conservative treatment including recreational activities such as swimming, Tai Chi and yoga. (R. 309-10). On December 19, 2017, Plaintiff advised PA-C Michael Hood ("PA-C Hood") that he could not afford medical marijuana.[6] (R. 301). As Plaintiff's activity level was unchanged, PA Hood recommended an intrathecal pump trial. (*Id.*). As Plaintiff awaited authorization, he noted "some relief" from the increased Norco and Vicodin, and continued to demonstrate normal musculoskeletal results. (R. 706, 709).

As of February 26, 2018, Plaintiff was denied clearance for the intrathecal pump due to major depressive issues that Plaintiff did not wish to address. (R. 706-07). He continued to report chronic lumbosacral pain with marked radicular features mostly in the right hip and lumbar spine, despite normal musculoskeletal findings. (R. 706-07; *see also* R. 692, 695, 699, 704, 710). Therefore, PA-C Martino arranged for Medtronic's representative to assist him in optimizing the spine stimulator at his next pain management follow-up. (R. 703, 706). In

---

[6] Plaintiff's medical marijuana license was also revoked when he admitted to obtaining it illegally in March 2018. (R. 703).

addition, on March 26, PA-C Martino increased his Vicodin to the maximum amount since his medications only alleviated his pain by 30% and he was not "entirely content" with this result. (R. 703-04; *see also* Docket No. 21 at 10 n.14).  In April and June, however, Plaintiff reported roughly the same pain levels and still minimal benefit from the stimulator; he admitted to consuming up to four Norco tablets "due to immense pain." (R. 694, 698).  PA-C Christine S. Alaka adjusted his Norco prescription and prescribed hydromorphone, (R. 695), but Plaintiff never took hydromorphone because it was too expensive, (R. 691).

At a follow-up with Dr. Rowe on August 15, 2018, Plaintiff explained that the spinal cord stimulator had not provided significant relief and inquired into further treatment options. (R. 582).  He described his pain as "constant" and "severe," at a 9/10 at its worst, a 6/10 at its best, and currently, 8/10. (*Id.*).  He still complained of lower extremity weakness as well as numbness and pins and needles in his feet and legs. (*Id.*).  In addition to standing, sitting, walking and exercise, coughing and sneezing now increased his pain. (*Id.*).  This time, he could only walk about three blocks, sit for twenty to thirty minutes, and stand for ten to fifteen minutes. (*Id.*).  Medication provided a 10% to 30% benefit. (*Id.*).  Dr. Rowe's examination revealed tenderness to palpation in the bilateral paravertebral area of the lumbar spine; decreased range of motion, flexion and extension; diminished deep tendon reflexes on both sides; and otherwise normal results. (R. 584).  Dr. Rowe opined that Plaintiff had "failed" the stimulator and exhausted "every method of treatment" for "chronic intractable pain." (R. 585).  Concerned of a high risk for opioid analgesics, she prescribed a trial of MS Contin and increased gabapentin. (*Id.*; *see also* R. 680).  By November 19, the combination of MS Contin and gabapentin provided 60% relief. (R. 670).  Plaintiff's spinal cord stimulator was removed on January 21, 2019. (R. 526-27).

For the remainder of his treatment, Plaintiff demonstrated a normal or slightly antalgic gait; the same tenderness to palpation in the lumbar spine; restricted lumbar spine range of motion; diminished but symmetrical lower extremity deep tendon reflexes; and proximal weakness or decreased sensation in the right leg.[7] (R. 588, 618, 623-26, 631-34, 640, 644, 647, 651, 655, 657, 660, 662, 669).  Plaintiff received cervical and lumbar spine X-rays on December 24, 2018, which showed anterior flowing osteophytes at C2 through C6 as well as straightening of the cervical lordosis. (R. 410, 518).  A February 25, 2019 lumbar spine MRI revealed mild to moderate disc herniation that was unchanged from the 2016 study, as well as small diffuse bulges at L3-L4 at L4-L5. (R. 716).  At a consultation on March 19, PA-C Caneiro advised against spinal surgery, as it would require multilevel fusion—which had a poor predictive level of improvement. (R. 657).  Plaintiff noted new pain in the extremities and feet on April 15, (R. 654), and on May 13, complained that MS Contin had caused insomnia and an upset stomach over the past two to three months, (R. 650).  Plaintiff switched to a fentanyl patch for three months, but restarted MS Contin because the patch did not help his insomnia and was less effective in managing his pain. (R. 639-40, 646, 650).  By the end of 2019, Plaintiff was "content" with a lower dosage of MS Contin and gabapentin, reporting no more side effects and "moderate" relief, at 30-50%. (R. 625-26, 631).  He noted twice that gabapentin helped his hand and foot pain. (R. 639, 643).

In addition to his lumbar spine and extremity issues, on July 29, 2019, Plaintiff complained of new right shoulder pain stemming from "multiple . . . dislocations." (R. 643).  The pain worsened over the second half of the year and into early 2020, triggering complaints of

---

[7] Plaintiff otherwise had full lower extremity strength, and consistent with his earlier musculoskeletal examinations, his straight leg tests were negative, and Plaintiff had no atrophy, fasciculations, cyanosis, clubbing or edema. (R. 588, 618, 623-26, 633-34, 640, 644, 647, 651, 655, 657, 660, 662, 669).

weakness and limited range of motion. (R. 598, 618, 624, 625, 639).  Indeed, his remaining in-person pain management examinations in 2019 and 2020 demonstrated limited right shoulder abduction, and 4/5 right shoulder strength, both secondary to pain. (R. 618, 623-26, 632-34, 640).  A November 30, 2019 MRI showed high grade partial tearing and delamination of the supraspinatus tendon insertion; moderate grade tearing of the subscapularis tendon insertion; mild partial tearing of the infraspinatus tendon insertion; moderate tendinopathy of the biceps; tenosynovitis; acute sublabral tearing with effusion, synovitis, bursitis and capsulitis; and moderate AC joint arthritis. (R. 715).

On February 10, 2020, Plaintiff saw Dr. Joseph Giovinazzo ("Dr. Giovinazzo"), an orthopedist. (R. 598).  Plaintiff explained that his right shoulder pain was moderate and sharp, at a 7/10, during both activity and at rest. (*Id.*).  An examination revealed limited flexion and abduction, with "some pain and weakness with rotator cuff resistance." (*Id.*).  Dr. Giovinazzo noted warm lower extremities on both sides as well as pain and decreased range of motion in the neck. (*Id.*).  He also identified some AC joint arthritis based on an X-ray from the same day. (*Id.*).  Dr. Giovinazzo diagnosed Plaintiff with frozen shoulder, but opined that both shoulders were "stable." (R. 598-99).  He recommended physical therapy. (*Id.*).

Despite these new shoulder issues, Plaintiff continued to express "satisfact[ion]" with his treatment until his last pain management follow-up on May 14, 2020. (R. 615, 617, 623, 736).  As of February 24, 2020, Plaintiff's back and shoulder pain was ongoing and still caused pain in the extremities "at times," but he had begun using Voltaren gel in combination with his medications and was "[c]ontent with his reduced pain." (R. 617-18).  Indeed, he reported between 25 and 50% relief, without adverse side effects, at monthly sessions in January,

February, April[8] and May. (R. 615, 617, 623, 736).  At his last appointment on May 14, Plaintiff reported back pain at 6/10 with neuropathy in the feet and hands as well as leg weakness, but again stated he was "content with his response to care." (R. 736).  PA-C Martino opined that Plaintiff was "[s]table on pain medication with analgesia without notable side effects or any obvious aberrant behaviors." (R. 737-38).  She advised him not to drive or operate machinery while on opioids, benzodiazepines or muscle relaxants. (R. 738).

2.    **Advantage Care Physicians**

During the relevant period, Plaintiff had physicals as well as podiatry and endocrinology appointments at Advantage Care Physicians ("Advantage Care").  Although the focus of these examinations was Plaintiff's diabetes and thyroid issues, his providers noted back and lower extremity complaints until the end of 2018.  For example, Plaintiff complained of back pain to Dr. Mamdouh Lozah ("Dr. Lozah") at his physicals on August 29 and November 7, 2017, as well as on July 30, 2018. (R. 273, 279, 395).  Dr. Lozah opined that Plaintiff's "disease course . . . [was] worsening" on July 30, (R. 395), but consistently noted normal neck and musculoskeletal ranges of motion as well as reflexes, (R. 273, 278, 394).  At Plaintiff's last physical on February 11, 2019, Dr. Lozah noted these same results and no complaints of pain. (R. 380-81).

At podiatry appointments on October 6, 2017 and August 31 as well as October 19, 2018, Dr. John F. Pace ("Dr. Pace") noted pedal pulses at 2/4 bilaterally. (R. 289, 390, 394).  Plaintiff had normal sensation in all digits in October 2017, but in August and October 2018, showed pain on palpation of the left arch heel, decreased sensation to light touch bilaterally, and fibroma. (*Id.*).  A left foot X-ray on August 31 showed plantar and dorsal calcaneal enthesophytes as well

---

[8] Due to the COVID-19 pandemic, Plaintiff's last two appointments in April and May 2020 were virtual. (R. 615, 736).  Consequently, there are no musculoskeletal examination results for those dates.

as degenerative changes at the first metatarsophalangeal joint. (R. 408-09).  That said, Plaintiff's left foot "fe[lt] better" at the October 19, 2018 examination. (R. 390).

Plaintiff also visited Dr. Hanna Fiby, an endocrinologist, on December 11, 2018. (R. 388).  Although he was in "mild distress for back radiculopathy," he exhibited a supple neck; no muscle, bone or extremity tenderness; and no edema on examination. (*Id.*).  He denied muscle weakness. (*Id.*).

## C.   Medical Opinions

### 1.   Consultative Examiner Dr. Aurelio Salon

Dr. Aurelio Salon ("Dr. Salon") conducted an internal medicine consultative examination on April 18, 2018. (R. 371).  Plaintiff reported daily neck pain at 6 to 7/10, causing headaches and radiating to both upper extremities. (*Id.*).  He also complained of lower back pain at 7/10 radiating to both hips and knees—especially after standing and sitting for over fifteen minutes— despite placement of the spinal stimulator in 2017. (*Id.*).  X-rays and MRIs had demonstrated bulging discs and arthritis of the neck and spine. (*Id.*).  In addition, Plaintiff experienced diabetic nerve pain in his feet and legs. (*Id.*).  Plaintiff could shower and dress himself, but sometimes needed his brother's help to put on shoes and socks. (R. 372).  His brother performed his household chores. (*Id.*).

On examination, Plaintiff had a normal gait and stance. (*Id.*).  He needed no help changing or getting on and off of the exam table. (*Id.*).  He was also able to rise from his chair without difficulty. (*Id.*).  However, he declined to squat; walk on his heels or toes; or exhibit lumbar spine ranges of motion. (R. 372-73).  He also had difficulty lying down and getting up from a supine position.  (R. 373).  His neck was supple, and his cervical spine showed full range of motion. (*Id.*).  Furthermore, Plaintiff had full range of motion in his shoulders, elbows, forearms, wrists, hips, knees and ankles. (*Id.*).  A straight leg test was negative bilaterally, and

11

Plaintiff's joints were stable and nontender. (*Id.*).  Dr. Salon did not identify any scoliosis, kyphosis, abnormality in the thoracic spine, subluxations, contractures, ankylosis, thickening, redness, heat, swelling or effusion. (*Id.*).  He also noted no cyanosis, clubbing or edema in the extremities; no sensory deficits; normal deep tendon reflexes; and full extremity strength. (*Id.*).  Lumbar spine X-rays taken at the examination showed moderate degenerative spondylosis at L2-L3 through L4-L5, and a transitional vertebral body at L5. (R. 375).  Cervical spine X-rays showed moderate degenerative spondylosis at C5-C6 and C6-C7, straightening, and an old moderate compression fracture at C7. (R. 376).

Dr. Salon diagnosed, *inter alia*, low back pain and a history of neck pain, spine arthritis and diabetes. (R. 374).  In a medical source statement, he assigned a fair prognosis and opined that "there are no objective findings to support . . . restrict[ion] in [Plaintiff's] ability to sit or stand." (*Id.*).  However, Dr. Salon opined that Plaintiff's low back pain "currently restricted" "his capacity to climb  . . . [and] push, pull or carry heavy objects." (*Id.*).

## 2.    State Agency Examiner Dr. L. Samuel

On May 7, 2018, Dr. L. Samuel ("Dr. Samuel") conducted an RFC assessment based on a review of the medical record and Dr. Salon's examination. (R. 70-73).  Dr. Samuel opined that Plaintiff was capable of light work. (R. 70).  In addition, Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, and otherwise push and/or pull without limitations. (R. 72).  Plaintiff could stand and/or walk for about six hours in an eight-hour workday, and sit for the same amount of time. (*Id.*).  Plaintiff could occasionally stoop, kneel, balance, crouch, crawl, and climb ramps, stairs, ladders, ropes and scaffolds. (R. 72-73).

## 3.    Dr. Rowe

On August 8, 2018, Dr. Rowe evaluated Plaintiff's functional capabilities in a "Spinal Medical Source Statement." (R. 415).  She diagnosed Plaintiff with diabetic neuropathy, lumbar

12

degenerative changes, and lumbar disc displacement with radiculopathy. (*Id.*).  Her clinical findings included limited range of motion as well as tenderness in the lumbar spine, and sensory loss in the lower extremities and feet. (*Id.*).  She noted that Plaintiff had a neuroanatomical distribution of "constant" pain in his lower extremities, at a severity of 8/10, which was aggravated by activity, ambulation and weather changes. (*Id.*).

Dr. Rowe opined that Plaintiff could sit for about two hours and stand/walk for less than two hours in an eight-hour workday. (R. 416).  In addition to regular breaks, Plaintiff needed three hours of rest in a supine position during an eight-hour workday. (*Id.*).  Plaintiff could frequently lift or carry one to five pounds; occasionally lift or carry six to ten pounds; and rarely or never lift or carry over eleven pounds. (*Id.*).  Plaintiff's symptoms would interfere with his attention and concentration in performing simple tasks "daily," making him off task for over 25% of a typical workday and requiring thirty minute breaks. (R. 417).  He would also be absent over four times per month. (*Id.*).

## D.   Nonmedical Evidence

## 1.   Plaintiff's Function Report

Plaintiff completed a function report on February 18, 2018. (R. 200-09).  At that time, he lived with family and typically spent his day sitting on a chair or lying in bed and watching television. (R. 200, 204).  He could not be in either position for too long and could not lie on his back at all. (R. 200-01).  Plaintiff's illnesses prevented him from walking to the store, grocery shopping, vacuuming, sweeping, cooking, working, visiting friends and family, going to the park, and running errands. (R. 201, 204-05).  Plaintiff needed help from family to dress, bathe and cook, as he could not "stand that long." (R. 201-02).  He prepared meals on his own twice per week. (R. 202).  Plaintiff could not clean or do any household chores, and only left his apartment twice per week for medical appointments or to walk his sister to her car. (R. 202-03).

He could not drive, so his siblings shopped for him. (R. 203-04).  Plaintiff did not handle a savings account due to overdrafting issues. (R. 204).  His social interactions were limited to talking to his sister while she did his chores and family visits at his apartment. (R. 205).

Plaintiff experienced "extreme pain when trying to lift," and reiterated that he could not stand long enough to cook. (*Id.*).  He could only walk a "couple of feet," *i.e.*, from his car to the doctor's office, before needing a break. (R. 205-06).  Similarly, he needed to take breaks when climbing stairs. (R. 205).  Plaintiff's breaks were "a minute or two" long. (R. 206).  He could not sit for long, only squatted when using the toilet, and did not kneel—if he dropped an object, his siblings picked it up. (R. 205).  Because he was tall, Plaintiff did not struggle to reach objects "much" and kept necessities within arms' length. (*Id.*).  He was right-handed. (R. 206).

Plaintiff asserted that he was "easy going" and "only stress[ed] when the pain in [the] spine hit[]." (R. 207).  Plaintiff experienced foot and "shooting" right leg pain when he spent too long in one position. (R. 208).  His pain had started eight years ago, and it fluctuated between a dull pain and a stabbing pain when he needed to switch positions. (R. 207-08).  Plaintiff felt the pain constantly, and it had gotten worse over time. (*Id.*).  Although gabapentin and hydrocodone provided some relief within thirty minutes, they "dull[ed]" Plaintiff's pain instead of relieving it. (R. 208).  These medications caused drowsiness as well as loss of appetite and taste. (R. 209).  Plaintiff's spinal cord stimulator did not relieve the pain at all. (*Id.*).

## 2.    Plaintiff's Testimony

Krystal Matos, Esq. represented Plaintiff at the June 18, 2020 hearing. (R. 38-65).  Plaintiff testified that he was 43 years old and completed high school. (R. 46-47).  He last worked as a porter in December 2016, which he had done for over five years. (R. 47).  He also worked for "TSA doing security" from 2003 to 2008. (*Id.*).  As a porter, he lifted a maximum of

twenty pounds "taking out the garbage," and as a security guard, he lifted suitcases "as much as" fifty pounds. (R. 48).

Plaintiff asserted that he could no longer work due to lack of mobility; an inability to "do things for too long" due to pain; and stiffening in "[c]ertain parts of [his] body" that prevented him from moving. (R. 49). He could walk for twenty minutes; stand for fifteen or twenty minutes; and sit for thirty minutes. (R. 50). Due to muscle weakness on his right side, Plaintiff could not "carry too much at all" on the right—not even "simple things like pens." (*Id.*). He explained that he had "dropped plenty of things," including his phone, and sometimes lacked the strength to write with a pen. (R. 53). Plaintiff could carry "a gallon of milk" on the left, but at times, had dropped "[his] cup" with that side. (R. 53-54). Plaintiff had tried physical therapy, injections and a spinal cord stimulator as treatment. (R. 49). However, physical therapy was not very helpful, and the stimulator was removed. (R. 49, 53).

In addition, before Plaintiff stopped working, he was diagnosed with neck arthritis, which caused headaches "last[ing] half a day." (R. 51). Plaintiff regularly woke up with headaches, or experienced them from "keep[ing] [his] head down or up for too long." (*Id.*). When Plaintiff initially tried medication for the headaches, they caused vertigo, dizziness and shaking in his eyes. (*Id.*). Plaintiff's current medication regimen included morphine sulfate, gabapentin and Voltaren gel, but the morphine sulphate caused drowsiness requiring three to four hour-long naps per day. (R. 51-52).

Furthermore, Plaintiff suffered from concentration issues. (R. 53). His pain sometimes forced him to stop doing chores such as washing dishes, and he would forget to finish these tasks later. (*Id.*). He had forgotten to turn off the stove "a few times." (*Id.*).

Plaintiff's current daily activities mainly included "laying down due to . . . pain,"

watching television and staying "home all day." (R. 48).  He also did two hours-worth of

stretches, but "not all at on[ce]." (*Id.*).  Plaintiff did laundry weekly and lived alone. (R. 49).  His

brother ran his errands and shopped for him until the start of the COVID-19 pandemic, after

which Plaintiff had his groceries delivered. (R. 49, 52).  Plaintiff's brother also took him to

medical appointments, and helped him "reach certain spots" when bathing. (R. 49, 53).  Plaintiff

had good days and bad days, when he would take an hour to an hour-and-a-half to get out of bed

due to his pain. (R. 54).

**3.     Vocational Expert Testimony**

Vocational Expert ("VE") Mark A. Pinti testified that Plaintiff's past work as a security

guard was light, medium and semi-skilled work with a Specific Vocational Preparation ("SVP")

of 3, and his work as a porter was medium, unskilled work with an SVP of 2. (R. 56-57).

The ALJ posed a hypothetical to VE Pinti, asking him to assume an individual of

Plaintiff's age, education and work experience, with a residual functional capacity for light work

with the following additional limitations: the individual can occasionally lift twenty pounds, and

can frequently lift ten pounds; can stand and/or walk up to six hours, and can sit up to six hours;

can occasionally push or pull, climb ramps or stairs, balance or stoop, and reach overhead; can

never climb ladders, ropes or scaffolds, operate foot controls, or kneel, crouch, or crawl; and can

frequently reach, handle, finger or feel. (R. 57).  The individual can only tolerate "[m]oderate

office type noise or lights," and must avoid exposure to hazardous machinery, unprotected

heights, and operating moving machinery. (*Id.*).  VE Pinti testified that such an individual would

be able to perform the jobs of merchandise marker, parking lot cashier or inspector. (R. 57-58).

In a second hypothetical, the ALJ asked VE Pinti to consider the same factors in

hypothetical one, except that the individual is limited to simple, routine and repetitive work. (R.

58).  VE Pinti testified that the same jobs would be available. (*Id.*).

In a third hypothetical, the ALJ asked VE Pinti to consider the same factors in hypothetical two, except that the individual is further limited to sedentary work; can stand and/or walk for up to two hours; and can only lift ten pounds "occasionally or frequently." (*Id.*).  In addition, the individual would be able to sit for thirty minutes, and then would be permitted to change to standing for three minutes while on task. (*Id.*).  Furthermore, the individual would be able to stand and/or walk in up to fifteen minute increments, before being allowed to sit for three minutes, before resuming standing and/or walking, all while on task. (R. 58-59).  VE Pinti testified that such an individual would be able to perform the jobs of sedentary inspector, document preparer and order clerk. (R. 59).

In a fourth hypothetical, the ALJ asked VE Pinti to consider the same factors in hypothetical one, except that the individual is further limited to only occasionally handling and fingering. (*Id.*).  VE Pinti testified that such an individual would be able to perform the jobs of fruit distributor, photofinishing counter clerk, and stenciler. (R. 60-61).

Plaintiff's counsel then posed a fifth hypothetical, asking VE Pinti to consider an individual with the same limitations as those in the fourth hypothetical, except that he is off task for 25% percent of the time. (R. 62).  VE Pinti testified that no jobs would be available for such an individual because he would be "unproductive" for more than 10% of the time. (*Id.*).  Plaintiff's counsel then asked whether this analysis would apply for sedentary as well as light work; and for an individual who does sedentary or light work and who is absent more than four times per month for medical reasons. (*Id.*).  VE Pinti testified that no jobs would be available for an individual in these situations as well. (*Id.*).

**D.      The ALJ's Decision**

ALJ Loewy first determined that Plaintiff met the insured status requirements of the

Social Security Act ("Act") through December 31, 2021. (R. 26).  The ALJ then applied the five-

step procedure established by the Commissioner for evaluating disability claims. *See* 20 C.F.R.

§§ 404.1520(a), 416.920(a). (R. 26-32).  At step one, the ALJ found that Plaintiff had not

engaged in substantial gainful activity since December 8, 2018, the alleged onset date. (R. 26).

At step two, the ALJ found that Plaintiff had the following severe impairments: (1) obesity, (2)

degenerative disc disease of the lumbar spine, status post gunshot wound, (3) gout and plantar

fasciitis, and (4) a right shoulder disorder. (*Id.*).  At step three, the ALJ found that Plaintiff did

not have an impairment or combination of impairments that met or medically equaled the

severity of one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20

C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (R. 27).

The ALJ determined that Plaintiff has the residual functional capacity ("RFC") to

perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except that Plaintiff is limited to

lifting ten pounds occasionally or frequently; sitting up to six hours; and standing and/or walking

up to two hours in an eight-hour workday and up to fifteen minute increments at a time, before

being allowed to sit for three minutes while on task, before resuming standing or walking. (R.

38).  After sitting for thirty minutes, Plaintiff must be able to change positions to standing at the

workstation for three minutes, while staying on task. (*Id.*).  Plaintiff can occasionally push or

pull; climb ramps or stairs; and balance or stoop. (*Id.*).  He can never climb ladders, ropes or

scaffolds; operate foot controls; or kneel, crouch or crawl. (*Id.*).  He can frequently reach, handle,

finger and feel, except he can only occasionally reach overhead. (*Id.*).  Plaintiff can tolerate only

moderate office noise and lights, and must avoid exposure to hazardous machinery, unprotected

heights, and operational control of living machinery. (*Id.*).  In arriving at the RFC, the ALJ

considered all of Plaintiff's symptoms and their consistency with the objective medical evidence

and other evidence in the record. (R. 28-32).  The ALJ ultimately determined that while

Plaintiff's "medically determinable impairments could reasonably be expected to cause the

alleged symptoms," Plaintiff's "statements concerning the intensity, persistence and limiting

effects of these symptoms are not entirely consistent with the medical evidence and other

evidence in the record." (R. 28-29).  The ALJ found Dr. Salon's opinion "persuasive," and the

rest of the opinions unpersuasive. (R. 30).

At step four, the ALJ determined that Plaintiff was not capable of performing his past

relevant work because the physical demands of this work exceeded his RFC. (R. 31).  However,

considering Plaintiff's age, education, work experience and RFC, the ALJ opined that there are

jobs that exist in significant numbers in the national economy that Plaintiff could perform. (R.

31-32).  The ALJ concluded that Plaintiff was not disabled under the Act. (R. 32).

## II.  DISCUSSION

Plaintiff argues that the ALJ's decision should be reversed and remanded for further

administrative proceedings for three reasons: (1) the ALJ improperly considered the opinion

evidence, (Docket No. 21 at 17-23); (2) the RFC is not otherwise supported by substantial

evidence, (*id.* at 23-24); and (3) the ALJ erroneously analyzed Plaintiff's credibility, (*id.* at 24-

26).  The Commissioner responds that the ALJ properly considered the opinion evidence; the

RFC was supported by substantial evidence; and the ALJ properly analyzed Plaintiff's credibility

based on only mildly to moderately abnormal medical findings and Plaintiff's reported

improvement with treatment. (Docket No. 25 at 18-30).

19

A.     **Legal Standards**

A claimant is disabled if he or she "is unable 'to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. §

423(d)(1)(A)).  The SSA has enacted a five-step sequential analysis to determine if a claimant is

eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial
> gainful activity; (2) whether the claimant has a severe
> impairment or combination of impairments; (3) whether the
> impairment meets or equals the severity of the specified
> impairments in the Listing of Impairments; (4) based on a
> "residual functional capacity" assessment, whether the claimant
> can perform any of his or her past relevant work despite the
> impairment; and (5) whether there are significant numbers of
> jobs in the national economy that the claimant can perform given
> the claimant's residual functional capacity, age, education, and
> work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117,

120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).  The claimant has

the general burden of proving that he or she is statutorily disabled "and bears the burden of

proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176 (quoting *Burgess*,

537 F.3d at 128).  At step five, the burden then shifts "to the Commissioner to show there is

other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443,

445 (2d Cir. 2012).

When reviewing an appeal from a denial of supplemental security income or disability

benefits, the Court's review is "limited to determining whether the SSA's conclusions were

supported by substantial evidence in the record and were based on a correct legal standard."

*Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145,

151 (2d Cir. 2012)); *see also* 42 U.S.C. § 405(g).  Substantial evidence means "relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139

S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. of New York v. N.L.R.B.*, 305 U.S.

197, 229 (1938)).  Put another way, a conclusion must be buttressed by "more than a mere

scintilla" of record evidence. *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).  The

substantial evidence standard is "very deferential" to the ALJ. *Brault*, 683 F.3d at 448.  The

Court does not substitute its judgment for the agency's "or determine *de novo* whether [the

claimant] is disabled." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (alteration

in original) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998)).

However, where the proper legal standards have not been applied and "might have

affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty

to review the decision of the administrative agency by simply deferring to the factual findings of

the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748

F.2d 109, 112 (2d Cir. 1984)).  Therefore, "[f]ailure to apply the correct legal standards is

grounds for reversal." *Id.*

On January 18, 2017, the SSA considerably revised its regulations for evaluating medical

evidence.  The rules went into effect on March 27, 2017, and therefore, apply to the instant case.

Under the new regulations, the treating physician rule no longer applies. *See* 20 C.F.R. §§

404.1527(c)(2), 416.927(c)(2).  Therefore, no special deference is given to the treating

physician's opinion. *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Instead, "[the Commissioner]

will articulate in [his] determination or decision how persuasive [he] find[s] all of the medical

opinions." 20 C.F.R. §§ 404.1520c(b), 416.920c(b).  The updated regulations also define a

"medical opinion" as "a statement from a medical source about what [the claimant] can still do despite [their] impairment(s) and whether [they] have one or more impairment-related limitations or restrictions" in their "ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling or other physical functions . . . " 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).  Thus, a medical opinion must discuss both a claimant's limitations and "what [the claimant] is still capable of doing" despite those limitations. *Michael H. v. Saul*, 5:20-CV-417(MAD), 2021 WL 2358257, at *6 (N.D.N.Y. June 9, 2021).  Relatedly, conclusory statements by a claimant's provider concerning issues reserved to the Commissioner — for instance, whether the claimant is disabled under the Act — are "inherently neither valuable nor persuasive" and will not be analyzed by the ALJ. 20 C.F.R. §§ 404.1520b(c), 416.920b(c).

**B.**     **The ALJ's RFC Determination and Analysis of the Opinion Evidence**

Plaintiff makes several interrelated arguments regarding the ALJ's analysis of the opinion evidence and its impact on the RFC determination.  Plaintiff contends that the ALJ failed to properly analyze the supportability and consistency of Dr. Rowe and Dr. Salon's opinions under the new regulations. (Docket No. 21 at 17-21, 23).  Plaintiff asserts that the ALJ erroneously analyzed Dr. Rowe's opinion by (a) ignoring evidence supporting Dr. Rowe's conclusions; and (b) substituting her judgment for that of a medical professional. (Docket Nos. 21 at 17-21; 26 at 4-5).  Plaintiff additionally argues that the ALJ improperly relied on Dr. Salon's opinion because it is vague, outdated, incomplete and not based on a relevant specialty; and, because the ALJ improperly relied on this opinion, the RFC is based on a lay interpretation of medical findings. (Docket Nos. 21 at 21-24; 26 at 6-8).  The Commissioner responds that the ALJ correctly analyzed both opinions under the new regulations, and properly weighed Dr. Rowe's opinion against Dr. Salon's and the medical findings in the record. (Docket No. 25 at 18-26).  The

Commissioner further maintains that Dr. Salon's opinion is not outdated and is sufficient when viewed in the context of his entire report. (*Id.* at 23-24).

The RFC is an "individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, 1996 WL 374184, at *2) (internal quotations omitted). The RFC determination is reserved to the Commissioner. *See Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (summary order). When determining the RFC, the ALJ considers "a claimant's physical abilities, mental abilities, [and] symptomatology, including pain and other limitations that could interfere with work activities on a regular and continuing basis." *Weather v. Astrue*, 32 F. Supp. 3d 363, 376 (N.D.N.Y. 2012) (citing 20 C.F.R. § 404.1545(a)). "[T]he RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence." *Glessing v. Comm'r of Soc. Sec.*, No. 13 Civ. 1254(BMC), 2014 WL 1599944, at *9 (E.D.N.Y. Apr. 21, 2014) (quoting *Wichelns v. Comm'r of Soc. Sec.*, No. 5:12–CV–1595 (NAM/ATB), 2014 WL 1311564, at *6 (N.D.N.Y. Mar. 31, 2014)) (internal quotations omitted). Nevertheless, ALJs are not medical professionals. *See Heather R. v. Comm'r of Soc. Sec.*, 1:19-CV-01555(EAW), 2021 WL 671601, at *3 (W.D.N.Y. Feb. 22, 2021). The ALJ must refrain "from 'playing doctor' in the sense that [he] 'may not substitute his own judgment for competent medical opinion.'" *Quinto v. Berryhill*, Civ No. 3:17-CV-00024(JCH), 2017 WL 6017931, at *12 (D. Conn. Dec. 1, 2017) (quoting *Staggers v. Colvin*, No. 3:14CV00717(SALM), 2015 WL 4751108, at *3 (D. Conn. June 17, 2015), *report and recommendation adopted*, 2015 WL 4751123 (D. Conn. Aug. 11, 2015)). Accordingly, unless the claimant has more than "minor physical impairments," *Jaeger-Feathers v. Berryhill*, 1:17-CV-06350(JJM), 2019 WL 666949, at *4 (W.D.N.Y. Feb. 19,

2019), an ALJ is not qualified "to assess residual functional capacity on the basis of bare medical findings," *Kinslow v. Colvin*, Civil Action No. 5:12-cv-1541(GLS/ESH), 2014 WL 788793, at *5 (N.D.N.Y. Feb. 24, 2014).

Under the new regulations, rather than the source of a medical opinion, the most important factors in evaluating the opinion's persuasive value when arriving at the RFC are supportability and consistency. *See* 20 C.F.R. § 416.920c(b)(2).  In articulating the persuasiveness of a particular opinion, the ALJ must "explain how [h]e considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [his] determination or decision." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). "Supportability concerns the degree to which the 'objective medical evidence and supporting explanations presented by a medical source' support the medical opinion; consistency concerns the degree to which the medical opinion is consistent with the other evidence in the record." *Quiles v. Saul*, 19-CV-11181 (KNF), 2021 WL 848197, at *9 (S.D.N.Y. Mar. 5, 2021) (quoting 20 C.F.R. §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2)).

In addition to supportability and consistency, the ALJ must also consider—but need not expound on—three other factors, including (a) the relevant provider's relationship with the claimant (which, in turn, incorporates five sub-factors); (b) specialization; and (c) other factors, *i.e.*, anything else that "tend[s] to support or contradict a medical opinion." *See* 20 C.F.R. §§ 404.1520c(b)(2), (c)(3)-(5), 416.920c(b)(2), (c)(3)-(5).  The specialization factor "recognizes that a specialist giving an opinion within their specialty may be more persuasive than an opinion given by a non-specialist or a specialist in a less relevant field." *Acosta Cuevas v. Comm'r of Soc. Sec.*, 20-CV-0502 (AJN)(KHP), 2021 WL 363682, at *10 (S.D.N.Y. Jan. 29, 2021), *report and*

*recommendation adopted sub nom. Cuevas v. Comm'r of Soc. Sec.*, 2022 WL 717612 (S.D.N.Y. Mar. 10, 2022).

## 1.     Dr. Rowe

Plaintiff argues that the ALJ's supportability analysis with respect to Dr. Rowe's opinion was flawed because the ALJ (1) did not properly contend with Dr. Rowe's supporting explanation regarding Plaintiff's neuroanatomical distribution of pain; and (2) rejected Dr. Rowe's conclusions based on a lay interpretation of Dr. Rowe's findings. (Docket Nos. 21 at 18; 26 at 2-6).  Plaintiff further contends that the ALJ misapplied the consistency factor by ignoring medical evidence that supported Dr. Rowe's opinion. (Docket Nos. 21 at 18; 26 at 5-6).

The new regulations require that when applying the supportability factor, the ALJ must address two components: (1) the evidence cited by each medical source "to support th[at source's] opinion[] and reach their ultimate conclusion[];" and (2) that source's objective clinical findings. *See Balotti v. Comm'r of Soc. Sec.*, 20-CV-8944 (RWL), 2022 WL 1963657, at *6 (S.D.N.Y. June 6, 2022) (quoting *Acosta Cuevas*, 2021 WL 363682, at *14) (internal quotations omitted); *see also Melissa S. v. Comm'r of Soc. Sec.*, 5:21-CV-420 (DJS), 2022 WL 1091608, at *4 (N.D.N.Y. Apr. 12, 2022).  Thus, an ALJ's rejection of a particular opinion based on the underlying clinical findings, without addressing the source's "explanations and what he considered in arriving at his opinion," ordinarily constitutes error. *See Balotti*, 2022 WL 1963657, at *5.  An ALJ also cannot simply reject an opinion without explaining "how [the source's] findings [a]re inconsistent" with the particular restrictions assigned, as doing so impermissibly substitutes the ALJ's expertise for that of a medical professional. *See Sutton v. Comm'r of Soc. Sec.*, 20-CV-3441 (PKC), 2022 WL 970748, at *6 (E.D.N.Y. Mar. 31, 2022) (citing *Flynn v. Comm'r of Soc. Sec. Admin.*, 729 F. App'x 119, 121 (2d Cir. 2018) (summary order)).  On the other hand, it is well-established that "[a]n ALJ need not recite every piece of

evidence that contributed to the decision, so long as the record 'permits [the court] to glean the rationale of an ALJ's decision.'" *Cichocki*, 729 F.3d at 178 n.3 (2d Cir. 2013) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)).

Here, the ALJ did not explicitly address Dr. Rowe's opinion that Plaintiff's neuroanatomical distribution of pain was aggravated by walking, activity and weather changes. (R. 30, 415). Plaintiff argues that this omission constitutes reversible error because the ALJ "failed to properly articulate [her] consideration of the supportability factor." (Docket No. 21 at 18-19). However, "it is not difficult to glean what evidence underlies and supports the ALJ's conclusions," in light of the relatively limited medical records and the ALJ's thorough discussion of the other aspects of Dr. Rowe's opinion as well as the evidence as a whole. *See Maria C. T. v. Comm'r of Soc. Sec.*, No. 5:20-CV-1521 (DEP), 2022 WL 2904367, at *8 (N.D.N.Y. July 22, 2022). Early in her decision, the ALJ expressly acknowledged the "axial and radicular . . . features" of Plaintiff's pain. (R. 29). Turning to Dr. Rowe's opinion, the ALJ reasoned that the record "does not show a level of pain that would" preclude work involving six hours of sitting and off-task time for 25% of the workday, as Dr. Rowe assessed, and citing Dr. Salon's opinion as an example. (*Id.*). The ALJ then addressed the supportability of Dr. Rowe's opinion with respect to her objective findings, stating that "[e]ven Dr. Rowe's own facility's exam notes indicate normal examinations except for tenderness, limited range of motion in the lumbar spine and shoulder, and sensory loss in the lower extremities and bilateral feet." (*Id.*). The ALJ cited a plethora of examinations from Healthcare Associates that reflected these same results, as well as neuropathy and pain aggravated by activity and walking. (R. 30, 318, 615). However, these examinations also showed that by April 2020, Plaintiff experienced "satisfactory relief" when he

took his medication and was "content with h[is] reduced level of pain."[9] (R. 615).  The ALJ also explained that Dr. Rowe's analysis was inconsistent with Dr. Salon's consultative examination, and elsewhere in her decision, appropriately noted that physical examinations revealed normal ranges of motion, and an MRI indicated only "mild to moderate" disc herniation. (R. 29, 30, 273, 278, 394, 716).

It is clear from this discussion that the ALJ considered the very evidence underlying Dr. Rowe's explanation, yet concluded that it did not support the prohibitive level of pain that Dr. Rowe discussed—a determination that was reasonable in light of Plaintiff's treatment history, and thus, supported by substantial evidence. *See Maria C. T.*, 2022 WL 2904367, at *8; *Sean Michael S. v. Comm'r of Soc. Sec.*, No. 5:20-CV-0942 (DEP), 2021 WL 5918922, at *9 (N.D.N.Y. Dec. 15, 2021) (finding that ALJ correctly applied supportability and consistency factors "[b]ecause it [wa]s clear that the ALJ considered whether [podiatrist's] opinion was consistent with and supported by the record as required by the regulations").  The ALJ's analysis also reveals that contrary to Plaintiff's contentions, rather than conducting a lay assessment of Dr. Rowe's findings, the ALJ simply drew from Dr. Rowe's own assessments as well as Plaintiff's reported pain levels in the treatment notes to conclude that Plaintiff's pain improved over time. *See Davis v. Comm'r of Soc. Sec.*, 20-cv-05773 (SDA), 2021 WL 5826369, at *10 (S.D.N.Y. Dec. 8, 2021) (upholding ALJ's decision that "was not based on his own interpretation of [doctor]'s treatment notes, but rather his assessment of the record as a whole"); (Docket No.

---

[9] The ALJ also explicitly acknowledged this reduction in pain when discussing Plaintiff's treatment history at Healthcare Associates. (R. 29).

21 at 18).  Accordingly, the ALJ's discussion of the supportability of Dr. Rowe's opinion was adequate under the new regulations.[10]

The Court also rejects Plaintiff's argument that the ALJ erroneously applied the consistency factors to Dr. Rowe's opinion.[11]  (Docket No. 21 at 19).  The consistency factor is "an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record, not just what a medical source had available to them." *Acosta Cuevas*, 2021 WL 363682, at *10.  "While an ALJ is entitled to reconcile conflicting evidence in the record, and need not address every last piece of medical evidence[]" when conducting this analysis, "the ALJ must provide a reviewing Court with a sufficient explanation to ensure that they have complied with the legal procedures controlling their decision and cannot ignore or mischaracterize evidence." *Id.*; *see also Mongeur*, 722 F.2d at 1040.

Here, Plaintiff contends that the ALJ improperly ignored evidence that supports Dr. Rowe's opinion, such as positive imaging and examination findings as well as Plaintiff's lack of improvement with the spine stimulator and various medications. (Docket Nos. 21 at 19-20; 26 at 3-4).  However, the ALJ's explanation is sufficient to assure the Court that she considered this countervailing evidence in rendering her decision.  To be sure, the ALJ did not reference every single imaging study on record, or expressly note that Plaintiff sometimes demonstrated an antalgic gait or right leg weakness. (*E.g.*, R. 328, 643).  However, the ALJ was not required to do

---

[10] Moreover, assuming, *arguendo*, that the ALJ's failure to mention the entirety of Dr. Rowe's explanation constitutes procedural error, such error was harmless because the ALJ adopted walking and sit/stand limitations to account for Plaintiff's fluctuating lower extremity pain in the RFC. (R. 28).  Thus, inclusion of the missing information "would not have changed the outcome of the [ALJ's] decision." *See Dayle B. v. Saul*, Civil No. 3:20-cv-00359 (TOF), 2021 WL 1660702, at *10 (D. Conn. Apr. 28, 2021); *see also Maria C. T.*, 2022 WL 2904367, at *8.

[11] Plaintiff's contention that the Commissioner "failed . . . to meaningfully respond to Plaintiff's argument on this point," and therefore, waived the opportunity to respond, is baseless. (Docket No. 26 at 6).  The Commissioner devoted almost two pages to the consistency of Dr. Rowe's opinion, noting that the ALJ addressed this factor when she explained that it was "not fully consistent with the record," (R. 30), and "discussed substantial evidence to support the finding that [Dr. Rowe's] opinion was not persuasive." (Docket No. 25 at 21-23).

so. *See Mongeur*, 722 F.2d at 1040 ("[W]e are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony.") (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (internal quotations omitted); *see also Melissa F. v. Comm'r of Soc. Sec.*, 1:20-CV-1363 (WBC), 2021 WL 3887256, at *5 (W.D.N.Y. Aug. 31, 2021) (finding consistency analysis sufficient despite failure to cite particular contradictory evidence in consistency discussion).

Indeed, the ALJ's decision as a whole sufficiently makes clear that the ALJ found Dr. Rowe's opinion inconsistent with Plaintiff's overall treatment history, despite the contradictory evidence Plaintiff cites. The ALJ's consistency analysis specifically references Dr. Salon's examination and accompanying X-rays, which demonstrated a normal gait, a negative straight leg test, no sensory deficits, full extremity strength, full cervical spine range of motion, and moderate degenerative spondylosis in the lumbar and cervical spine. (R. 30, 372, 375-76). Moreover, throughout her decision, the ALJ documented Plaintiff's struggle to find appropriate pain treatment, as well as five specific examinations revealing many of the symptoms and findings that Plaintiff cites. (R. 28-30, 304, 318, 333, 618, 620). The ALJ also expressly acknowledged that Plaintiff's back pain spread to his "feet and legs;" that Plaintiff complained of "mobility" issues; and that while the spine stimulator provided "minimal benefit," Plaintiff eventually found a medication regimen that reduced his pain by 40 to 50%, with which Plaintiff was "content." (R. 28-30; *see also* R. 615, 617, 623, 625-26, 631, 736). Thus, the Court is satisfied that the ALJ was aware of the issues highlighted by Plaintiff, but simply was not persuaded that they rendered him disabled. Because of this contradictory evidence concerning the extent of Plaintiff's limitations, "[i]t [wa]s for the SSA, and not this court, to weigh the conflicting evidence." *See Schaal*, 134 F.3d at 504. Accordingly, the ALJ did not err in her analysis of Dr. Rowe's opinion.

## 2.    Dr. Salon

Plaintiff contends that the ALJ also erred because she "failed to explain how Dr. Salon's opinion was supported by and consistent with the record," which prevented her from accounting for Plaintiff's treatment history after Dr. Salon's examination, including the removal of his spinal cord stimulator and frozen shoulder diagnosis. (Docket No. 21 at 23; *see also* Docket No. 26 at 7).  Plaintiff further contends that Dr. Salon's opinion does not constitute substantial evidence because it was rendered before these treatment developments and is impermissibly vague, incomplete, and not based on a relevant specialty. (Docket Nos. 21 at 22-23; 26 at 7-8). Defendant maintains that Dr. Salon's opinion is sufficient to support the RFC when viewed in connection with his underlying examination findings and the rest of the record. (Docket No. 25 at 23-26).  Defendant also maintains that the ALJ sufficiently accounted for Plaintiff's subsequent history by rendering a more restrictive RFC than Dr. Salon recommended. (*Id.*).

### i.    Supportability and Consistency

As an initial matter, the Court finds that the ALJ applied the supportability and consistency factors to Dr. Salon's opinion in accordance with the new regulations. (*See* Docket No. 21 at 23).  The ALJ discussed Dr. Salon's opinion in detail several times throughout her decision and, contrary to Plaintiff's contentions, explicitly addressed these factors. (Docket No. 21 at 23; R. 30).  When describing Plaintiff's overall treatment history, the ALJ noted that Dr. Salon's 2018 examination resulted in negative straight leg testing and normal cervical spine range of motion. (R. 29).  The ALJ again referenced the opinion when discussing Plaintiff's deteriorating shoulder condition in 2019, acknowledging that Dr. Salon "did not note severe restriction of the right arm" when he examined Plaintiff, but that Dr. Giovinazzo's February 2020 examination revealed limited range of motion, pain and weakness, and that this impairment was "confirmed" by positive imagine studies. (R. 30).  The ALJ then found Dr. Salon's opinion

"persuasive" because it was "*supported* by the results of his exam" and "*consistent* with the treatment notes" that the ALJ had already discussed. (*Id.*) (emphasis added).  These include notes from (a) Healthcare Associates, showing relatively normal examinations except for tenderness, limited lumbar spine and shoulder range of motion, and lower extremity sensory loss; and (b) Advantage Care, showing normal musculoskeletal range of motion and reflexes both before and after the spinal stimulator's removal. (R. 29-30; *see also* R. 278-79,[12] 291-370, 380-81, 576-80, 605-738).  The ALJ explained that despite these relatively benign results, she would "giv[e] the claimant the benefit of the doubt" and assign "additional limitations" in the RFC. (R. 30).

This express discussion of the supportability and consistency factors, combined with the ALJ's comparisons of Dr. Salon's findings with other evidence in the record, was sufficient under the regulations, and was supported by substantial evidence. *See Sonia N. B. A. v. Kijakazi*, Civil No. 3:21-CV-00709-TOF, 2022 WL 2827640, at *8 (D. Conn. July 20, 2022) (denying remand where ALJ "explicitly discussed" opinion's consistency and supportability while assessing it in comparison to the entire record); *Rosario v. Comm'r of Soc. Sec.*, CIVIL ACTION NO. 20 CIV. 7749 (SLC), 2022 WL 819810, at *10 (S.D.N.Y. Mar. 18, 2022) (finding that ALJ complied with new regulations by analyzing provider's treatment records against her opinion, as well as comparing her opinion "with the longitudinal record as an additional basis to find . . . [it] persuasive").  Rather than overlooking Plaintiff's frozen shoulder diagnosis and the failure of the spine stimulator, the ALJ explicitly acknowledged the occurrence of both events. (R. 29-30). The ALJ also contended with Dr. Rowe's opinion and underlying treatment notes, but found that they were largely consistent with Dr. Lozah and Dr. Salon's examinations, based on which Dr. Salon assigned a much less restrictive functional assessment. (R. 30).  Moreover, to account for

---

[12] The ALJ states that this treatment note from Advantage Care reflects a December 2017 examination, but the page cited is from an August 29, 2017 examination. (R. 29, 282).

Plaintiff's frozen shoulder and ongoing complaints, the ALJ incorporated reaching, lifting and

sit/stand limitations in the RFC, thus rendering an assessment that was consistent with the record

as a whole. (R. 28, 30); *see infra* Section II.B.2.ii, 3.  Thus, the ALJ properly "weigh[ed]" Dr.

Salon's opinion with other conflicting evidence, a task that the Court cannot consider *de novo*.

*See Sonia*, 2022 WL 2827640, at *9; *see also Schaal*, 134 F.3d at 504.

**ii.     Whether Dr. Salon's Opinion Was Stale**

For similar reasons, the Court is unpersuaded by Plaintiff's argument that Dr. Salon's

opinion was too stale to support the RFC. (Docket No. 21 at 22).  "The . . . passage of time does

not render an opinion stale[;] [i]nstead, a medical opinion may be stale if subsequent treatment

notes indicate a claimant's condition has deteriorated." *Whitehurst v. Berryhill*, 1:16-cv-01005-

MAT, 2018 WL 3868721, *4 (W.D.N.Y. Aug. 14, 2018).  "The mere diagnosis of additional

impairments[] . . . [also] does not render [an] opinion stale" absent "evidence of accompanying

additional limitations." *Deborah Elaine L. v. Comm'r of Soc. Sec.*, 6:20-CV-06607 (EAW), 2022

WL 2662974, at *4 (W.D.N.Y. July 11, 2022); *see also Hernandez v. Colvin*, 15-CV-6764 CJS,

2017 WL 2224197, at *9 (W.D.N.Y. May 22, 2017) ("[A] medical opinion is [not] stale merely

because it pre-dates other evidence in the record, where . . . the subsequent evidence does not

undermine [the provider]'s conclusions.").  "A more remote medical opinion may in fact

constitute substantial evidence if it is consistent with the record as a whole." *Marozzi v.

Berryhill*, No. 6:17-cv-06864-MAT, 2019 WL 497629, at *7 (W.D.N.Y. Feb. 8, 2019).

Courts routinely decline to remand based on reliance on an allegedly stale consultative

opinion where the ALJ reconciled the examiner's findings with the claimant's subsequent

treatment developments and additional limitations. *See, e.g.*, *Lorraine M. v. Comm'r of Soc. Sec.*,

1:19-CV-1515 (CJS), 2021 WL 681286, at *6 (W.D.N.Y. Feb. 22, 2021) (upholding ALJ's

reliance on consultative opinion because ALJ properly analyzed its supportability yet

acknowledged that the examiner could not "assess Plaintiff's spine" impairments and that the totality of the record warranted additional restrictions); *Jacquelyn C. o/b/o C.J.N. v. Comm'r of Soc. Sec.*, 19-CV-1647-MJR, 2021 WL 508388, at *3 (W.D.N.Y. Feb. 11, 2021) (finding no error in reliance on consultative opinion despite subsequent treatment developments where "the ALJ acknowledged that subsequent evidence in weighing the opinion and, as a result, found greater limitations"); *Jeffery M. v. Comm'r of Soc. Sec.*, 3:19-CV-435 (TJM), 2020 WL 3637646, at *8 (N.D.N.Y. July 6, 2020) (declining to find that "ALJ relied on 'stale' portions of the consultative examination, since he acknowledged that Plaintiff's medical condition had evolved . . . , cited medical evidence that explained the changing state of Plaintiff's shoulder, and relied on those portions of the opinions that addressed medical conditions that still remained fairly consistent during the relevant time").  Similarly here, whereas Plaintiff's frozen shoulder caused some additional limitations in 2019 and 2020, the ALJ recognized this fact when addressing Dr. Salon's opinion, and therefore, increased Plaintiff's restrictions. (R. 30)  The ALJ also observed that even after Plaintiff's shoulder diagnosis and the spine stimulator's removal, his musculoskeletal and sensory examination results excluding shoulder range of motion were unchanged—and Plaintiff even expressed satisfaction with his pain levels. (R. 29-30; *e.g.*, R. 615, 617-18, 623-26, 633-34, 736).  The ALJ thus reasonably found Dr. Salon's opinion consistent with the evidence pertaining to his back and lower extremity issues, and "found a more restrictive RFC based on the totality of the record." *See Desirae D. v. Comm'r of Soc. Sec.*, Case No. 20-cv-00054, 2021 WL 2042576, at *4 (W.D.N.Y. May 21, 2021).  Thus, it was proper for the ALJ to rely on Dr. Salon's opinion despite Plaintiff's later right shoulder issues.

**iii.   Vagueness and Incompleteness**

Plaintiff's contention that Dr. Salon's opinion was impermissibly vague and incomplete is also meritless. (Docket Nos. 21 at 21-22; 26 at 8).  Specifically, Plaintiff alleges that Dr.

Salon's failure to define the word "restricted" when describing his capacity to climb, push, pull, or carry "heavy objects" was insufficient because it did not specifically explain the scope of Plaintiff's abilities. (Docket No. 21 at 22); (*see also* R. 374).  Plaintiff also claims that it was error to rely on this opinion because Dr. Salon did not test Plaintiff's ability to walk on his heels and toes, squat or demonstrate lumbar spine ranges of motion. (Docket No. 26 at 8).

Plaintiff is correct that the "use of imprecise and nebulous terms regarding functional limitations raises a red flag." *Anderson v. Colvin*, Civil Action No. 5:12-cv-1008 (GLS/ESH), 2013 WL 5939665, at *9 (N.D.N.Y. Nov. 5, 2013).  However, somewhat vague terminology regarding the extent of a claimant's restrictions does not render a medical opinion "useless in all situations." *See Keller v. Comm'r of Soc. Sec.*, No. 5:15-CV-0309 (GTS/WBC), 2016 WL 8732643, at *8 (N.D.N.Y. June 10, 2016); *see also Zongos v. Colvin*, No. 5:12-cv-1007 (GLS/ESH), 2014 WL 788791, at *10 (N.D.N.Y. Feb. 25, 2014) ("[W]hether an [ALJ]'s reliance on a consultative examiner's vague opinion is reversible error is contextual rather than *per se*. Reviewing courts must weigh the impart of vague opinion in its unique factual circumstance.").  This is because "the opinion[], coupled with the other medical [and non-medical] evidence, [may be] sufficient to support the inference drawn" and clarify the claimant's precise limitations. *See Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order);[13] *see also*

---

[13] The Court disagrees with Plaintiff that *Tankisi* is inapposite. *See* 521 F. App'x at 34; (Docket No. 26 at 6-7).  Plaintiff states, in a conclusory fashion, that the record in this case is not sufficiently "voluminous" to warrant comparison to *Tankisi*. (Docket No. 26 at 7).  However, Plaintiff does not identify any gaps or explain why the record was insufficient to render a functional assessment.  Moreover, although the consultative examiner in *Tankisi* examined the claimant twice, *see* 521 F. App'x at 34, the ALJ here considered both a consultative and treating physician opinion, in addition to a state agency assessment, (R. 30).  The ALJ also had the benefit of treatment notes from almost monthly pain management follow-ups regarding the impairments at issue, as well as neurology, orthopedic, primary care, podiatry and endocrinology examinations throughout the relevant period. (R. 29-30; *e.g.*, 289, 301, 318, 325, 339, 388, 395, 598).  The combination of these records was more than sufficient to supplement Dr. Salon's report. *See Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (summary order) (upholding RFC determination where aspects of consultative opinion were rejected but ALJ relied on clinical findings and treatment notes).  Furthermore, Plaintiff's assertion that remand is required simply because Dr. Salon examined him only once, (Docket No. 21 at 23), ignores well-established precedent that a single consultative examination may provide

*Crivera v. Acting Comm'r of Soc. Sec.*, 16-CV-6095 (RRM), 2018 WL 4688945, at *11 (E.D.N.Y. Sept. 27, 2018) (finding that even if consultative examiner's use of the word "limited" to describe certain abilities "was too vague," the RFC determination was "supported by the evidence in the record as a whole"); *Davis v. Massanari*, No. 00 Civ. 4330 (SHS), 2001 WL 1524495, at *8 (S.D.N.Y. Nov. 29, 2001) (holding that while doctor's opinion "might, by itself, [have] be[en] 'so vague as to render it useless,' the facts underlying that opinion and the other medical opinions in the record lend[ed] it a more concrete meaning") (quoting *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000)).

That is the case here.  Viewed in the context of his "entire[]" report and the rest of the record, Dr. Salon's opinion is sufficient to support the RFC for "a limited range of sedentary work, the least physically demanding of the work categories." *See Crystal D. v. Saul*, 19-CV-06696-MJR, 2021 WL 672022, at *4 (W.D.N.Y. Feb. 22, 2021).  Plaintiff ignores that, in addition to assigning some exertional limitations, Dr. Salon opined that Plaintiff had "no . . . restrict[ion] in his ability to sit or stand"—a finding that the ALJ also considered—and that Dr. Salon based his opinion on a fulsome examination including musculoskeletal testing and X-rays. (R. 371-76).  The results of the examination included a normal gait and stance; no difficulties in changing clothes, getting on and off of the exam table, or rising from a chair; full ranges of motion in the cervical spine, elbows, forearms, wrists, hips, knees, and ankles; no thoracic spine abnormalities; a negative straight leg test; nontender and stable joints; normal deep tendon reflexes; full extremity strength; and moderate spondylosis in the lumbar and cervical spine. (R. 372-73).  Moreover, the ALJ relied on a plethora of other medical evidence, including treatment notes showing (a) restricted right shoulder range of motion, but 4/5 strength after Plaintiff's

---

substantial evidence if it is consistent with the record as a whole. *See Domm v. Colvin*, 579 F. App'x 27, 28–29 (2d Cir. 2014) (summary order); *Mongeur*, 722 F.2d at 1039.

frozen shoulder diagnosis; and (b) some instances of limited lumbar spine range of motion, tenderness, and sensory loss in the lower extremities only. (R. 29-30; *e.g.*, R. 617-18, 623-26). Furthermore, the ALJ noted that despite Plaintiff's testimony that he could not lift or carry "very much," he conceded that he could carry a gallon of milk with his left arm. (R. 28, 53-54). The combination of this evidence, in addition to Dr. Salon's full report, provides support for the RFC limiting Plaintiff to sedentary work, with restrictions on Plaintiff's ability to climb; lift ten pounds; push/pull; and reach overhead. (R. 28).

Plaintiff is also incorrect that Dr. Salon's opinion cannot constitute substantial evidence simply because he did not assess Plaintiff's ability to walk on his heels and toes, squat or demonstrate lumbar spine ranges of motion. (Docket No. 26 at 8). Dr. Salon could not opine on these topics because Plaintiff declined to participate in those parts of the exam. (R. 372-73). The ALJ acknowledged this reality, and "incorporated Dr. [Salon]'s findings to the extent that they relied on the results of his examination and testing." *See Buie v. Colvin*, 14-CV-6528L, 2016 WL 463733, at *3 (W.D.N.Y. Feb. 8, 2016) (finding substantial evidence for weight afforded to consultative opinion despite "plaintiff's refusal to undertake certain tests"); (R. 29). Moreover, the ALJ's conclusions regarding Plaintiff's walking and postural limitations were consistent with the rest of the evidence, including Plaintiff's relatively normal gait and musculoskeletal examinations by PA-C Martino as well as Drs. Lozah and Rowe, (*e.g.*, R. 273, 278, 394, 584, 588, 618, 623-26), and his self-reported ability to walk in twenty-minute increments, (R. 50). *See Buie*, 2016 WL 463733, at *3; *see also Anderson v. Colvin*, No. 12-CV-0200 (MAT), 2014 WL 4269056, at *8 (W.D.N.Y. Aug. 28, 2014) (finding that ALJ "properly considered Plaintiff's postural limitations that were established by the medical evidence," including treatment notes, even though consultative examination on which he partially relied did not test "lumbar spine

maneuvers").  Accordingly, none of the deficiencies Plaintiff cites rendered the ALJ's reliance on Dr. Salon's opinion erroneous.

### iv.     Relevant Specialty

Plaintiff's cursory argument that the ALJ impermissibly relied on Dr. Salon's opinion "because it was . . . not based on relevant specialty" [*sic*] is also unfounded. (Docket No. 21 at 22).  The new regulations do not require rejection of a medical opinion merely because the examiner was not a specialist.  Instead, they "direct[] the ALJ to consider specialization in deciding how much weight to afford an opinion." *Robin P. v. Comm'r of Soc. Sec.*, 1:20-CV-863 (TJM), 2022 WL 593612, at *8 (N.D.N.Y. Feb. 28, 2022); *see also* 20 C.F.R. § 404.1520c(c)(4) ("The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her specialty than the medical opinion or prior medical finding a medical source who is not a specialist in the relevant area of specialty.").  Although the ALJ did not discuss Dr. Salon's internal medicine background, Plaintiff fails to identify any reason why his lack of more specific training "colored his opinion or makes that opinion automatically unreliable." See *Robin P.*, 2022 WL 593612, at *8.  Furthermore, as already discussed throughout this Section, the ALJ properly explained the weight she assigned this opinion in light of the medical evidence over the course of Plaintiff's treatment as well as Plaintiff's representations. *See id.*; *supra* Section II.B.2.i-iii.  The ALJ also credited clinical findings from Dr. Giovinazzo, an orthopedist, as well as multiple pain management providers from Healthcare Associates. (R. 29-30).  Therefore, substantial evidence supports the ALJ's reliance on Dr. Salon's opinion with respect to the specialty factor as well.

3.      **RFC Based on Lay Opinion**

Moreover, the ALJ's decision to "giv[e] [Plaintiff] the benefit of the doubt" by assigning more restrictions than Dr. Salon recommended was not erroneous, nor is the RFC faulty because it does not track a particular medical opinion. (R. 30); (Docket Nos. 21 at 23-24; 26 at 8).  "An ALJ is permitted to not only consider opinion evidence from a consultative examiner as substantial evidence but may also find greater limitations than opined." *Mendez v. Comm'r of Soc. Sec.*, CASE No. 19-cv-01036, 2020 WL 6424141, at *4 (W.D.N.Y. Nov. 2, 2020); *see also Ramsey v. Comm'r of Soc. Sec.*, 830 F. App'x 37, 39 (2d Cir. 2020) (summary order).  In addition, a medical source statement is not necessarily required where "the record contains sufficient evidence from which an ALJ can assess the [claimant]'s residual functional capacity." *Tankisi*, 521 F. App'x at 34.  Such evidence may include treatment notes as well as nonmedical evidence, including the Plaintiff's statements and activities of daily living. *See* 20 C.F.R. § 404.1545(a)(3); *see also Monroe*, 676 F. App'x at 9.  Moreover, "[a]lthough the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, [the ALJ] [i]s entitled to weigh all of the evidence available to make an RFC finding that [i]s consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order).  As a corollary to this rule, an ALJ's RFC finding need not "track any one medical opinion." *Byrd v. Colvin*, 15-CV-403 (RRM), 2016 WL 5678551, at *8 n.5 (E.D.N.Y. Sept. 28, 2016); *see also Cepeda v. Comm'r of Soc. Sec.*, 19-CV-4936 (BCM), 2020 WL 6895256, at *11 (S.D.N.Y. Nov. 24, 2020) ("[T]he determination of the claimant's RFC is reserved to the ALJ, who is not required to accept, or follow, any one medical opinion in toto.").

As discussed, there is substantial evidence to support the ALJ's RFC finding.  After explaining the persuasiveness of the opinions and analyzing Plaintiff's treatment history, the ALJ concluded that Plaintiff had the capacity for sedentary work with additional limitations. (R. 28-

30). This finding was supported by Dr. Salon's assessment of some exertional restrictions—but no limitations in standing and walking—as well as Plaintiff's mostly-normal musculoskeletal examinations over time showing limited shoulder and spine range of motion, tenderness and lower extremity sensory loss at times; decreased pain once he was prescribed an appropriate medication regimen; and imaging showing mild to moderate findings. (*E.g.*, R. 273, 278, 307-09, 374, 384, 394, 588, 615, 618, 623, 625-26, 643, 706, 709, 715-16). Despite the improved pain and relatively minor restrictions documented in these examinations, Plaintiff represented that he struggled with reaching as well as lifting heavy objects other than a gallon of milk, and that while he spent most of the day sitting or lying down, he frequently needed to change positions to account for ongoing pain. (R. 53-54, 200-05). Plaintiff further noted that he could sit for thirty minutes; stand and walk for fifteen to twenty minutes; and do two hours of stretching over the course of the day, but needed a "minute or two" for breaks between positions and when climbing. (R. 48, 50, 206). The ALJ thus rendered an RFC which included reaching, climbing, lifting, pushing and pulling limitations, as well as sit/stand requirements tracking these exact timeframes.[14] (R. 28). "It was within the ALJ's discretion to credit" Plaintiff's testimony and weigh conflicting medical evidence to craft an RFC that was consistent with the record. *See Deborah Elaine L.*, 2022 WL 2662974, at *4. The ALJ's RFC assessment thus permissibly considered all opinion evidence, as well as the nonmedical evidence, as explained in her decision. *See Matta*, 508 F. App'x at 56. Consequently, the Court will not disturb her conclusions. *See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) ("Where the

---

[14] Specifically, the RFC requires standing and/or walking for up to two hours in an eight hour workday, but only in fifteen minute increments before three-minute sitting breaks. (R. 28). It also gives Plaintiff the option to sit for thirty minutes followed by three minutes of standing. (*Id.*).

Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner.").

## C.    The ALJ's Consideration of Plaintiff's Symptoms

Plaintiff argues that the ALJ erred in disregarding his alleged debilitating symptoms because the ALJ failed to give sufficiently specific reasons for doing so. (Docket No. 21 at 24-27).  The Commissioner contends that the ALJ adequately explained that Plaintiff's statements were not entirely consistent with the medical and other evidence in the record. (Docket No. 25 at 29).

"[I]t is the function of the Commissioner to appraise the credibility of witnesses, including the claimant . . . [A]n ALJ is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Martes v. Comm'r of Soc. Sec.*, 344 F. Supp. 3d 750, 762–63 (S.D.N.Y. 2018) (quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)) (internal quotations omitted).  The regulations state that in evaluating the intensity and persistence of a plaintiff's alleged symptoms, including pain, the Commissioner will "consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [his or her] symptoms affect [him or her]." 20 C.F.R. § 404.1529(a).  However, the Commissioner "will not reject [a claimant's] statements about the intensity and persistence of [his or her] pain or other symptoms or about the effect [his or her] symptoms have on [his or her] ability to work solely because the available objective medical evidence does not substantiate [his or her] statements." 20 C.F.R. § 404.1529(c)(2).  Rule 16-3p directs the ALJ to specifically consider: (1) Plaintiff's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side

effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

(5) treatment, other than medication, an individual receives or has received for relief of pain or

other symptoms; (6) any measures other than treatment an individual uses or has used to relieve

pain or other symptoms; and (7) any other factors concerning an individual's functional

limitations and restrictions due to pain or other symptoms. *See* Soc. Sec. Ruling 16-3p: Titles II

& XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3P (S.S.A. Mar. 16, 2016).

  Plaintiff contends that the ALJ's credibility analysis was flawed because rather than

analyzing all seven of the above factors, she rejected Plaintiff's complaints based on a "rote

summary of the evidence." (Docket No. 26 at 9).  It is well-established, however, that although

the ALJ cannot "make a single, conclusory statement that the claimant is not credible or simply .

. . recite the relevant factors, . . . remand is not required where the evidence of record permits

[the Court] to glean" the ALJ's "rationale" in rendering a credibility assessment. *See Cichocki v.

Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (summary order) (quoting *Mongeur*, 722 F.2d at

1040) (internal quotations omitted).  As long as the ALJ provides "specific reasons for his

credibility determination" and sufficiently evaluates the claimant's symptoms, courts routinely

decline to remand simply because the ALJ failed to overtly discuss all seven factors. *See id.*; *see

also Foster v. Saul*, 18-CV-558F, 2019 WL 4291322, at *4 (W.D.N.Y. Sept. 11, 2019) (finding

credibility discussion sufficient where "a fair reading of the ALJ's Decision establish[ed] [that]

the ALJ . . . reference[d] [the record] to draw a critical contrast between Plaintiff's subjective

complaints and the objective medical evidence that would be expected to support such

complaints if the complaints were of the asserted intensity, persistence and limiting effects");

*Sabater v. Colvin*, Case No. 12-CV-4594 (KMK) (JCM), 2016 WL 1047080, at *6 (S.D.N.Y.

Mar. 10, 2016) ("The ALJ, however, was not obligated to explicitly reconcile each piece of

evidence he considered in his decision as long as it is clear, as is the case here, that he weighed all the evidence of Plaintiff s symptoms, both subjective and objective.").

Here, the ALJ's failure to cite all seven factors does not warrant remand because her decision as a whole makes clear that she assessed Plaintiff's allegations and found them inconsistent with the overall record, "including [Plaintiff's] own statements to his medical providers." *See Anthony D. v. Comm'r of Soc. Sec.*, 6:17-CV-1326 (ATB), 2019 WL 1081676, at *11 (N.D.N.Y. Mar. 7, 2019).  In addition to Plaintiff's activities of daily living—which were limited, but included the ability to lift a gallon of milk, sit for thirty minutes, stand for fifteen to twenty minutes, and walk for twenty minutes—the ALJ acknowledged the location and intensity of Plaintiff's back, shoulder, neck and lower extremity pain at various times throughout his treatment, as well as the fact that by the end of the relevant period, Plaintiff reported being "content with his reduced pain level." (R. 28-30, 50, 53-54, 617-18).  The ALJ also referenced the musculoskeletal results above revealing some tenderness and reduced range of motion, as well as the effectiveness of treatment methods such as the spine stimulator, physical therapy, and a medication regimen that ultimately brought Plaintiff's pain to tolerable levels. (R. 28-30; *e.g.*, R. 588, 615, 618, 623, 625-26, 643).  Although the ALJ did not evaluate each factor separately, these references throughout her decision sufficiently conveyed the reasons why she found Plaintiff's allegations inconsistent with his abilities, and there is ample evidence to support that conclusion. *See Foster*, 2019 WL 4291322, at *4; *Anthony D.*, 2019 WL 1081676, at *11. Although Plaintiff's complaints and some other evidence may support a different finding, it was the ALJ's purview to weigh such conflicts in the record. *See Schaal*, 134 F.3d at 504. Accordingly, the ALJ did not err when assessing Plaintiff's credibility.

## III.    CONCLUSION

For the foregoing reasons, Plaintiff's motion is denied and Defendant's cross-motion is granted.  The Clerk of the Court is respectfully requested to terminate the pending motions (Docket Nos. 20 and 24), and close the case.

Dated:    August 9, 2022
          White Plains, New York

                              **SO ORDERED:**

                              _____
                              JUDITH C. McCARTHY
                              United States Magistrate Judge

43